# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2022
No. 22-764

**JAY S. KRAVITZ,**
*Plaintiff-Appellant,*

v.

**SAMUEL PURCELL, ADOLPHUS BAKER, LUIS ANDREU, DAVID
MCCRAY, GREGORY ST. VICTOR, DAVID MCMAHON, JOSEPH
WASSWEILER, AND JOHN ZUPAN,**
*Defendants-Appellees.**

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MAY 3, 2023
DECIDED: NOVEMBER 27, 2023

Before:    KEARSE, JACOBS, and MENASHI, *Circuit Judges.*

---

* The Clerk of Court is directed to amend the caption as set forth above.

Plaintiff-Appellant Jay S. Kravitz, formerly incarcerated, appeals from the grant of summary judgment in favor of the defendants-appellees—corrections officers at Downstate Correctional Facility—on Kravitz's claims under 42 U.S.C. § 1983 for the violation of his First Amendment right to the free exercise of religion. According to Kravitz, the corrections officers violated his right to free exercise by preventing him from observing the Jewish holiday of Shavuot. The district court held that Kravitz failed to show a "substantial burden" on his religious beliefs because he was able to observe some aspects of the holiday. We conclude that a § 1983 plaintiff need not show a substantial burden in order to prevail on a claim for the violation of the First Amendment. Because Kravitz has shown that his sincere religious beliefs were burdened by the officers' conduct, we vacate the judgment of the district court insofar as the district court decided that Kravitz had failed to establish a genuine dispute of material fact as to whether his right to free exercise was violated. We affirm the judgment insofar as the district court granted summary judgment to certain defendants for whom there was no evidence of personal involvement. We remand for further proceedings consistent with this opinion.

––––––––––

Jay S. Kravitz, pro se, Earlton, NY, *for Plaintiff-Appellant*.

MARK S. GRUBE, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Judith N. Vale, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees*.

––––––––––

2

MENASHI, *Circuit Judge*:

Plaintiff-Appellant Jay S. Kravitz, proceeding pro se, appeals from a judgment of the U.S. District Court for the Southern District of New York granting summary judgment to the defendants-appellees, corrections officers at Downstate Correctional Facility. *See Kravitz v. Purcell*, No. 16-CV-8999, 2022 WL 768682 (S.D.N.Y. Mar. 4, 2022).

Kravitz, who was formerly incarcerated at Downstate Correctional Facility, brought claims under 42 U.S.C. § 1983 against the officers for violating his First Amendment right to the free exercise of religion. In his third amended complaint, Kravitz named as defendants corrections officers Samuel Purcell, Adolphus Baker, Luis Andreu, David McCray, Gregory St. Victor, David McMahon, Joseph Wassweiler, and John Zupan.[1] He alleged that the officers violated his First Amendment right to the free exercise of religion by preventing him from observing the Jewish holiday of Shavuot on two consecutive evenings. The district court granted summary judgment to the officers because (1) some named officers were not personally involved in the alleged violation on the first night of Shavuot, and (2) Kravitz's observance of the second night of the holiday was only shortened, not denied entirely, which did not rise to the level of a

---

[1] Third Amended Complaint ("TAC") ¶¶ 4-11, *Kravitz v. Purcell*, No. 16-CV-8999 (S.D.N.Y. Dec. 5, 2019), ECF No. 80. Kravitz's complaint misspells Wassweiler as "Waseiler." *Id.* ¶ 10. Kravitz also named as a defendant Anthony Annucci as the commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"). The district court dismissed the claims against Annucci following Annucci's unopposed motion to dismiss.

"substantial burden" on his religious beliefs. *Kravitz*, 2022 WL 768682, at *10.

We vacate in part and affirm in part the judgment of the district court. The district court erred in holding that Kravitz could not prevail on his claim because he did not make the threshold showing of a "substantial burden" on his religious beliefs. Such a showing is not required. Rather, because Kravitz has shown a burden on his sincere religious beliefs, he has established a genuine issue of material fact sufficient to defeat a motion for summary judgment. We vacate the judgment insofar as the district court granted summary judgment because of a purported "substantial burden" requirement, and we affirm the judgment insofar as the district court granted summary judgment to those officers for whom there was no evidence of personal involvement. We remand for further proceedings consistent with this opinion.

## BACKGROUND

In this appeal, we consider the factual assertions in the parties' Local Rule 56.1 statements and the admissible evidence submitted. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). [2] We "constru[e] the evidence in the light most favorable" to Kravitz. *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).

---

[2] Kravitz did not submit a Rule 56.1 Counter-Statement in response to the defendants' Rule 56.1 Statement. But given Kravitz's pro se status, the district court properly exercised its discretion to review the entire record—including Kravitz's Rule 56.1 Statement, affidavit, and deposition testimony—when deciding the defendants' motion for summary judgment. *Kravitz*, 2022 WL 768682, at *1.

4

# I

Kravitz practices Judaism and as part of that practice he celebrates the holiday of Shavuot. Shavuot "is one of the three major festivals in Judaism," and it "celebrate[s] the giving of the Torah or Law on Mount Sinai." Affidavit of Plaintiff ¶ 7, *Kravitz v. Purcell*, No. 16-CV-8999 (S.D.N.Y. Mar. 26, 2021), ECF No. 140. Kravitz considers Shavuot to be "the most important holiday of the Jews." Plaintiff's Deposition Transcript ("Kravitz Dep.") at 64, *Kravitz v. Purcell*, No. 16-CV-8999 (S.D.N.Y. Mar. 10, 2021), ECF No. 129-1. He observes the holiday by praying and eating together with other Jews for two consecutive evenings. In 2014, Kravitz requested that his name be added to the list of inmates who would participate in Shavuot observances at Downstate Correctional Facility for the evenings of June 3 and June 4.

# A

On June 3, 2014, Kravitz was released from his housing unit— Block 3a in Complex 3—at approximately 8:00 pm to attend Shavuot services. Kravitz and other Jewish inmates walked to what Kravitz calls a "staging area" and what the defendants identify as the East Lobby of Complex 3. But rather than allowing the inmates to continue to the dining hall for the scheduled prayer and meals, corrections officers threw paper bags containing peanut butter sandwiches, apple sauce, pudding, and juice at the inmates, "laughing and say[ing], here is your kosher meal. You Jew, blah, blah, and F-U." Kravitz Dep. at 67. The officers then announced that "everyone got their big holiday dinner, now go back to your cages." *Id.* at 68. The inmates complained to the officers that they were supposed to receive a "very good festive meal" and time to gather as a community, and Kravitz asked if the

5

inmates could at least eat the sandwiches together. *Id.* at 69. The officers responded, "[F]uck you. Shut up." *Id.* Kravitz's time in the staging area lasted about five minutes. *Id.* at 70. At approximately 8:25 pm, he walked back to his housing block, where he ate, prayed, and studied religious texts alone in his cell. *Id.* at 83.

At the time, Kravitz did not know the officers' names. In his complaint and affidavit, he alleged that the officers present in the staging area were Officers Andreu, Baker, McCray, Purcell, and St. Victor. These officers testified that they were not involved in the events underlying Kravitz's complaint; they either did not work on June 3 and 4 or they worked in different areas of the prison at the relevant times. On appeal, Kravitz instead identifies McMahon and Wassweiler "as the religious services officers [who] completely prevented him from observing Shavuot on the first night of the holiday." Appellant's Br. 17.

That night, Kravitz wrote a letter to prison officials complaining about his experience. A prison chaplain visited Kravitz's housing block and assured him that he would be permitted to observe the second night of the holiday.

**B**

On June 4, 2014, at around 7:50 pm, officers escorted Kravitz from his housing block to a dining area that Kravitz calls an "auxiliary dining hall," Supp. App'x 17, and the defendants call the "#4 Dining Room," *id.* at 10.

About ten inmates sat at a table, and the "cadre"—an inmate who ran the Jewish programs—asked Kravitz to lead the prayer services in Hebrew. Kravitz Dep. at 89-90. After only twenty or thirty

seconds, a corrections officer stopped the prayers. The "minute [Kravitz] started to speak in Hebrew and [pray]," the officer who was "running the meals" "put his hands between [Kravitz and the cadre], and like weaseled in between [them], and got in [Kravitz's] face and said, I don't want to hear that. You need to stop and get eating that food. I got things to do." *Id.* at 92. The corrections officer said, "yo, yo, stop that crap. I don't want to hear it. ... [L]ook, just shut the fuck up and get to eating. I got things to do." *Id.* at 94.

Kravitz attempted to resume his prayers, but after a few seconds the officer started "screaming" and "hit the table." *Id.* at 95. The officer "really got in [Kravitz's] face, nose to nose ... he was an inch from [him]. And he said, maybe you didn't hear me ... shut the fuck up, get to eating. All of you's now. I got things to do." *Id.* at 94-95.

Kravitz rushed to say a blessing over the bread so that the group could eat. He skipped the customary blessing and drinking of grape juice because, according to Kravitz, "I didn't want to piss him off. I seen guys in a puddle of blood there every day." *Id.* at 96. The inmates ate, but the same officer repeatedly returned to the table over the next ten minutes, ordering them, "Let's go. Let's go. Hustle, hustle." *Id.* at 97. Other officers directed the inmates to hurry and said that they did not have "time for your crap." *Id.* at 97. About twenty minutes after the inmates arrived in the dining area, they finished their meals and were escorted back to their blocks. *Id.* at 100. Kravitz returned to his housing block at about 8:45 pm.

Kravitz again did not know the officers' names. The defendants represented to the district court that on June 4, the "officers assigned to the Jewish holiday services were Officers D. McMahon and

7

Wassweiler" and that "Zupan was the area supervisor." *Valentin* Order Response ("*Valentin* Response") at 1, *Kravitz v. Purcell*, No. 16-CV-8999 (S.D.N.Y. Feb. 15, 2017), ECF No. 11. Based on that representation, Kravitz alleged in his complaint that these officers escorted the inmates to the dining hall and interfered with the religious observance. Zupan testified, however, that he was not in the dining hall on June 4. Accordingly, Kravitz now maintains that McMahon and Wassweiler "directly participated in the thwarting of his religious observance as the religious service officers throughout the holiday of Shavuot." Appellant's Br. 18.

## II

On November 18, 2016, Kravitz commenced this § 1983 action alleging the violation of his right to the free exercise of religion under the First Amendment as well as his rights under the Eighth Amendment, the Fourteenth Amendment, and the New York State Constitution. The initial complaint was brought against New York State, the DOCCS, Anthony Annucci as commissioner of the DOCCS, and "unknown members" of the DOCCS. Complaint, *Kravitz v. Purcell*, No. 16-CV-8999 (S.D.N.Y. Nov. 18, 2016), ECF No. 2. Pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), in which this court recognized that a pro se litigant is entitled to assistance in identifying defendants, the district court ordered the New York State Attorney General to identify the officers who were involved in the alleged incidents. In response, the Attorney General identified Purcell, Baker, Andreu, McCray, and St. Victor as the escort officers assigned to the gym and lobby in Complex 3 at Downstate Correctional Facility. The prison advised that these spaces may have been the "staging area" in which the alleged June 3 incident occurred. In addition, the Attorney

8

General identified McMahon and Wassweiler as the "officers assigned to the Jewish holiday services" and Zupan as the "area supervisor." *Valentin* Response at 1.

Kravitz amended his first amended complaint to identify these officers as defendants. On March 29, 2019, the district court dismissed all of Kravitz's claims in his second amended complaint except for his free exercise claims against Purcell, Baker, Andreu, McCray, St. Victor, McMahon, Wassweiler, and Zupan.[3] On December 5, 2019, Kravitz filed a third amended complaint that included only his free exercise claims. The parties proceeded to discovery and filed motions for summary judgment.

The district court granted the officers' motion and denied Kravtiz's motion. For the evening of June 3, 2014, the district court determined that Kravitz had not shown the personal involvement of the officers as required to establish liability under § 1983. The "undisputed evidence demonstrates that Zupan, Purcell, Baker, St. Victor, McCray, and Andreu were not personally involved in the alleged deprivation of Plaintiff's free exercise rights." *Kravitz*, 2022 WL 768682, at *6. McMahon and Wassweiler, moreover, were not alleged to have been personally involved in the events of that evening. *Id.* at *9. For the evening of June 4, 2014, the district court concluded that Kravitz had not met "his burden of demonstrating that his religious beliefs were substantially burdened." *Id.* at *10. "[T]he undisputed facts demonstrate that [Kravitz's] Shavuot

___

[3] The district court dismissed Kravitz's claim against Annucci without prejudice. After filing his third amended complaint, Kravitz submitted an affidavit informing the district court that he did not oppose Annucci's motion to dismiss the third amended complaint.

9

celebration was only shortened, not denied," because he was able to "congregate, pray, and eat a festive kosher meal with a group of other Jewish inmates until approximately 8:45 pm." *Id.* Kravitz "*was* able to observe the Shavuot holiday, albeit in a shortened and perhaps substandard manner," the district court said. *Id.* For that reason, he suffered only "a de minimis burden" on his free exercise rights. *Id.* (quoting *Hamilton v. Countant,* No. 13-CV-669, 2016 WL 881126, at *7 (S.D.N.Y. Mar. 1, 2016)).

This appeal followed.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo. Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger*, 642 F.3d at 344 (quoting Fed. R. Civ. P. 56(a)).

Pro se litigants receive "special solicitude" when "confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). "We liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *Publicola v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022) (internal quotation marks omitted).

## DISCUSSION

The Supreme Court has explained that inmates "retain protections afforded by the First Amendment, including its directive

that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted). In the prison context, alleged violations of the right to free exercise are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349. Therefore, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989) ("A prisoner's first amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests.") (internal quotation marks omitted).

The district court did not reach the question of whether the officers' actions were justified by legitimate penological interests. Instead, the district court granted the officers' motion for summary judgment on two grounds: the lack of a substantial burden on Kravitz's religious beliefs on June 4 and the lack of personal involvement by certain defendants on June 3. We address each issue in turn.

# I

The defendants argue that Kravitz cannot show that the events of June 4 amounted to a "substantial burden" on his religious beliefs because Kravitz "received a substantial kosher group meal," "prayed to bless the food," and "led the group in congregate prayers." Appellees' Br. 13-14.

11

The religion clauses of the First Amendment, applicable to the states through the Fourteenth Amendment, provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In prior cases, we have assumed—without holding—that to state a free exercise claim under § 1983, a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). [4] This "substantial burden test," we have explained, "requires courts to distinguish important from unimportant religious beliefs" in order to decide whether a "belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis." *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003). The "relevant question" under the test is whether engaging in the religious observance "is considered central or important to [the plaintiff's] practice of [his religion]." *Id.* at 593-94.

The substantial burden test originated in the Supreme Court's decision in *Sherbert v. Verner*, 374 U.S. 398 (1963). After a Seventh-day Adventist was fired for refusing to work on her Sabbath, she was denied unemployment benefits under a law that disqualified claimants who "failed, without good cause ... to accept available suitable work." *Id.* at 401. The Court explained that a state must justify "any incidental burden on the free exercise … of religion" by showing that the law serves a compelling state interest. *Id.* at 403. The Court

_____

[4] *See also Salahuddin*, 467 F.3d at 275 n.5 ("Resolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement.").

decided that the denial of benefits amounted to a "substantial infringement" of the plaintiff's free exercise rights and was not justified by a compelling state interest. *Id.* at 407.

While *Sherbert* did not expressly create a substantial burden requirement, subsequent decisions identified the requirement as part of the *Sherbert* framework of applying strict scrutiny to general laws that burden religious belief. "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it *unduly burdens* the free exercise of religion," the Court explained. *Wisconsin v. Yoder*, 406 U.S. 205, 235-36 (1972) (emphasis added). "The free exercise inquiry asks whether government has placed a *substantial burden* on the observation of a *central religious belief* or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) (emphasis added).[5]

Later, in *Employment Division v. Smith*, the Supreme Court held that the *Sherbert* framework did not apply when the challenged law was "neutral" and "generally applicable," even if the law incidentally burdened religious exercise. 494 U.S. 872, 879-80 (1990); *see also Holt v. Hobbs*, 574 U.S. 352, 357 (2015) ("*Smith* largely repudiated the method

---

[5] *See also Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981) ("Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith … thereby putting *substantial pressure* on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.") (emphasis added); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 143 (1987) ("The immediate effects of ineligibility and disqualification [for unemployment benefits] are identical, and the disqualification penalty is *substantial*.") (emphasis added).

13

of analysis used in prior free exercise cases like *Wisconsin v. Yoder* and *Sherbert v. Verner*.") (citations omitted). *Smith* explained that the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879 (internal quotation marks omitted).

In rejecting the *Sherbert* approach, *Smith* "took issue with the premise that courts can differentiate between substantial and insubstantial burdens." *Ford*, 352 F.3d at 592. "It is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field," the Court said in *Smith*. 494 U.S. at 886-87. "What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith?" *Id.* at 887.

After *Smith*, Congress adopted the Religious Freedom Restoration Act ("RFRA") to "restore the compelling interest test as set forth in *Sherbert v. Verner*." 42 U.S.C. § 2000bb(b)(1) (emphasis added). RFRA expressly adopts a substantial burden requirement. *See id.* § 2000bb-1 (providing that the "Government shall not *substantially burden* a person's exercise of religion even if the burden results from a rule of general applicability" unless "application of the burden" furthers "a compelling governmental interest" through "the least restrictive means") (emphasis added). In light of the statute, "we dutifully applied RFRA's substantial burden test to prisoners' free exercise claims" while RFRA "was still good law" as applied to state

governments. *Ford*, 352 F.3d at 592. RFRA no longer applies to state governments,[6] but we have continued to assume that the substantial burden test applies to prisoners' free exercise claims.

Despite doing so, we have acknowledged that applying the substantial burden test is "a task for which … courts are particularly ill-suited" and raises "the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent rather than confront the often more difficult inquiries into sincerity, religiosity and the sufficiency of the penological interest asserted to justify the burden." *Ford*, 352 F.3d at 593. And we have recognized that, since *Smith*, the legal validity of the substantial burden test remains an open question. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Salahuddin*, 467 F.3d at 274-75). "Whenever the question has arisen in our Circuit, the panel has avoided answering it by noting either that the parties did not brief the issue or that the requirement, even if applied, would have been satisfied." *Brandon v. Kintner*, 938 F.3d 21, 32 n.7 (2d Cir. 2019).[7]

---

[6] In *City of Boerne v. Flores*, the Supreme Court held that "[b]road as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance." 521 U.S. 507, 536 (1997).

[7] *See also Ford*, 352 F.3d at 592 (proceeding "on the assumption that the substantial burden test applies"); *McEachin v. McGuinnis*, 357 F.3d 197, 203

The district courts of this circuit have followed our example by proceeding "on the assumption that the substantial burden test applies." *Ford*, 352 F.3d at 592. Thus, despite the Second Circuit having "expressed doubt as to whether a prisoner is required to make this threshold showing," the "[d]istrict courts within this circuit continue to apply the substantial burden test when addressing free exercise claims." *Nicholson v. Ferreira*, No. 20-CV-1214, 2021 WL 327529, at *5 n.3 (D. Conn. Feb. 1, 2021).[8] That is what the district

(2d Cir. 2004) ("[W]e need not, at this stage, consider whether the plaintiff must demonstrate that the burden on his beliefs was 'substantial' in order to state a constitutional claim."); *Salahuddin*, 467 F.3d at 275 n.5 (declining "to address [the] argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement"); *Holland*, 758 F.3d at 221 (declining to address the "continued vitality of the substantial burden requirement"); *Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) ("[a]ssuming that the substantial burden requirement applies"); *Brandon*, 938 F.3d at 32 n.7 ("assum[ing], without deciding, that [the plaintiff's] free exercise claim is subject to the substantial burden requirement").

[8] *See, e.g.*, *McLeod v. Williams*, No. 18-CV-115, 2020 WL 2512164, at *3 (S.D.N.Y. May 15, 2020) ("Absent any contrary instruction from the Second Circuit, and because neither party argues that the substantial burden test is inapplicable to Plaintiff's claims here, the Court will proceed—as other courts in the district repeatedly have—by assuming the substantial burden requirement continues to apply."); *Lombardo v. Freebern*, No. 16-CV-7146, 2018 WL 1627274, at *8 n.12 (S.D.N.Y. Mar. 30, 2018) ("The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. This Court has already chosen to follow the analysis in *Holland* and thus will proceed under the assumption that the substantial burden test is still valid.") (citation omitted); *Jones v. Annucci*, No. 16-CV-3516, 2018 WL

court did in this case. "To succeed on a free exercise claim," the district court explained, "an inmate must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs," meaning that "participation in the religious activity, in particular, is considered central or important to the inmate's religious practice." *Kravitz*, 2022 WL 768682, at *8 (internal quotation marks and alterations omitted).

This case requires us to resolve this open question. Over the thirty years that the question has remained open, its irresolution has compelled courts to make questionable religious determinations that we must review on a standardless basis. *See Wiggins v. Griffin*, No. 21-533, 2023 WL 8009312, at *10 (Menashi, J., concurring) ("Three decades is too long for federal judges to be telling litigants which of their religious beliefs are 'unimportant.'") (quoting *Ford*, 352 F.3d at 593). Today we hold that a prisoner claiming a violation of the right

---

910594, at *13 n.8 (S.D.N.Y. Feb. 14, 2018) (same); *Washington v. Chaboty*, No. 9-CV-9199, 2015 WL 1439348, at *9 n.12 (S.D.N.Y. Mar. 30, 2015) ("In *Ford*, the court assumed that the substantial burden test applies, because the plaintiff had not argued otherwise. Similarly here, because [the plaintiff] has not argued that the substantial burden test is inapplicable, this Court has assumed that it applies.") (internal quotation marks, alteration, and citation omitted); *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL 769551, at *6 n.8 (S.D.N.Y. Feb. 24, 2015) ("[T]he Second Circuit and judges in this district have continued to require ... a threshold showing [of a substantial burden], particularly in cases where the parties have not argued otherwise."); *Vann v. Fischer*, No. 11-CV-1958, 2014 WL 4188077, at *8 n.14 (S.D.N.Y. Aug. 25, 2014) ("It is customary in this District, absent any contrary instruction from the Second Circuit, to assume that the substantial burden test survives.").

to the free exercise of religion under § 1983 need not make a showing of a substantial burden.

**A**

We have expressed "reluctance to measure the devotional import of certain religious practices" because "passing judgment on the 'centrality of different religious practices'" is "a misguided enterprise that the Supreme Court has called 'akin to the unacceptable business of evaluating the relative merits of differing religious claims.'" *McEachin*, 357 F.3d at 202 (quoting *Smith*, 494 U.S. at 887). In a non-prison context, we have even explained that "[b]ecause the free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires, courts are not *permitted* to inquire into the centrality of a professed belief to the adherent's religion." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (emphasis added) (internal quotation marks and alteration omitted). For that reason, "[a]n individual claiming violation of free exercise rights [under § 1983] need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Id.* (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). There is no reason why this same standard should not apply to a prison inmate alleging a violation of his free exercise rights under § 1983.

The Supreme Court has emphasized that courts should not inquire into the centrality of a litigant's religious beliefs. It is not "appropriate for judges to determine the 'centrality' of religious beliefs," and indeed the Court has "warned that courts must not presume to determine the place of a particular belief in a religion." *Smith*, 494 U.S. at 887. It is simply "not within the judicial ken to

question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Id.* (quoting *Hernandez*, 490 U.S. at 699).

*Smith* held that neutral laws of general applicability are not subject to strict scrutiny based, at least in part, on the recognition that a regime of exemptions from generally applicable laws requires some type of substantial burden inquiry. "[I]f general laws are to be subjected to a 'religious practice' exception, *both* the importance of the law at issue *and* the centrality of the practice at issue must be reasonably considered." *Smith*, 494 U.S. at 888 n.4. The *Smith* Court rejected that view.

But opposition to the centrality inquiry was not limited to the *Smith* majority. The concurrence in the judgment "agree[d] with the Court" that "our determination of the constitutionality of Oregon's general criminal prohibition cannot, and should not, turn on the centrality of the particular religious practice at issue." *Id.* at 906-07 (O'Connor, J., concurring in the judgment). And the dissent similarly "agree[d]" that "courts should refrain from delving into questions whether, as a matter of religious doctrine, a particular practice is 'central' to the religion." *Id.* at 919 (Blackmun, J., dissenting). All nine justices in *Smith* agreed that courts cannot inquire into the centrality or importance of a free exercise plaintiff's religious beliefs.

That broad agreement was based on longstanding precedent. *See, e.g.*, *Thomas*, 450 U.S. at 716 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner … more correctly perceived the commands of [his] … faith."); *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 720 (1976) (explaining that civil courts may not decide "quintessentially

religious controversies"); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969) (noting that, "[p]lainly, the First Amendment forbids civil courts" from evaluating "the interpretation of particular church doctrines and the importance of those doctrines to the religion").[9]

The Supreme Court has reiterated this principle since *Smith*.[10] Indeed, the "consistent and resounding theme echoed throughout

---

[9] "The notion of judicial incompetence with respect to strictly ecclesiastical matters can be traced at least as far back as James Madison, 'the leading architect of the religio[n] clauses of the First Amendment.'" *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 203 (2d Cir. 2017) (quoting *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 141 (2011)); *see* James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), *in* 5 The Founders' Constitution 82, 83 (Philip B. Kurland & Ralph Lerner eds., 1987) (rejecting the notion that "the Civil Magistrate is a competent Judge of Religious Truth"); *see also* Ira C. Lupu, *Where Rights Begin: The Problem of Burdens on the Free Exercise of Religion*, 102 Harv. L. Rev. 933, 959 (1989) ("[A]ny imaginable process for resolving disputes over centrality creates the spectre of religious experts giving conflicting testimony about the significance of a religious practice, with the state's decisionmaker authoritatively choosing among them. A horary and well-respected line of cases, concerning disputes over property between warring factions within a church, strongly suggests that judicial resolution of theological controversy is both beyond judicial competence and out of constitutional bounds.").

[10] *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ("Judicial review of the way in which religious schools discharge [religious] responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate."); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185 (2012) ("[I]t is impermissible for the government to contradict

many Supreme Court opinions" is that courts may not purport to evaluate the centrality or importance of religious beliefs. *DeHart v. Horn*, 227 F.3d 47, 56 (3d Cir. 2000).

Accordingly, since *Smith* the Supreme Court has treated a showing of the plaintiff's sincerity to be sufficient to establish a *prima facie* free exercise violation and has not referenced a substantial burden requirement. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022) ("Under this Court's precedents, a plaintiff may carry the burden of proving a free exercise violation … by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'") (quoting *Smith*, 494 U.S. at 879); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) ("[T]he City has burdened the religious exercise of [the plaintiff] through policies that do not meet the requirement of being neutral and generally applicable."); *Lukumi*, 508 U.S. at 531-47 (noting that no party has "questioned the sincerity of petitioners'" religious beliefs and addressing the free exercise violation without considering whether the burden was substantial).

When we are considering government policies that are not neutral and generally applicable—that is, policies that discriminate against religion rather than burden it incidentally—there is no justification for requiring a plaintiff to make a threshold showing of substantial burden. "The indignity of being singled out for special burdens on the basis of one's religious calling is so profound that the

a church's determination of who can act as its ministers."); *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) ("It is well established, in numerous … contexts, that courts should refrain from trolling through a person's or institution's religious beliefs.").

21

concrete harm produced can never be dismissed as insubstantial. The Court has not required proof of 'substantial' concrete harm with other forms of discrimination." *Locke v. Davey*, 540 U.S. 712, 731 (2004) (Scalia, J., dissenting).

**B**

Courts that apply the substantial burden test have reached puzzling conclusions. In *Levitan v. Ashcroft*, for example, the district court granted summary judgment to the prison officials on the ground that "consuming wine during Communion is not an essential aspect of [the Catholic inmates'] religious practice." 281 F.3d 1313, 1315 (D.C. Cir. 2002). In *Ford*, the district court decided that the denial of a religious meal to a Muslim inmate celebrating Eid al-Fitr was not a substantial burden because the postponed feast was "devoid of religious significance under the tenets of Islam" and the prison officials should not be required to "accommodate [the inmate's] particularized view of Islam, after having been advised of Islam's actual requirements by religious experts." *Ford v. McGinnis*, 230 F. Supp. 2d 338, 347 (S.D.N.Y. 2002), *vacated and remanded*, 352 F.3d 582 (2d Cir. 2003). In *Thompson v. Holm*, the district court decided that a Muslim inmate who was denied Ramadan meal bags for two days—and therefore did not receive a meal he could consume consistent with his religious obligations for fifty-five hours—did not suffer a substantial burden because he was still able to fast, pray, and read the Koran. *Thompson v. Holm*, No. 13-CV-930, 2015 WL 1478523, at *6 (E.D. Wis. Mar. 30, 2015), *vacated and remanded*, 809 F.3d 376 (7th Cir. 2016).

The district court's decision in this case marks another entry in this line of troubling decisions. The admissible evidence indicates that, on June 4, 2014, a corrections officer terminated Kravitz's holiday

prayer after about thirty seconds. The officer said "I don't want to hear that. You need to stop [praying] and get eating that food. I got things to do" and "stop that crap. I don't want to hear [prayers]. … [J]ust shut the fuck up and get to eating." Kravitz Dep. at 92-94. Nevertheless, the district court concluded that Kravitz did not suffer a substantial burden on his religious beliefs because Kravitz managed to pray for thirty seconds and to eat a communal meal. *Kravitz*, 2022 WL 768682, at *10. The district court determined that thirty seconds of prayer and a hurried meal meant that Kravitz was "able to observe the Shavuot holiday." *Id*. How did the district court reach that determination? It did not rely on Kravitz's beliefs about Shavuot or on authoritative statements of Jewish law. Evidently, the district court relied on its own authority to determine what the observance of Shavuot requires.

The Supreme Court long ago recognized that "no jurisdiction has been conferred" on civil courts to adjudicate "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S. 679, 733 (1871). In the context of an inmate's § 1983 action, however, we have persisted in the "misguided enterprise" of "measur[ing] the devotional import of certain religious practices." *McEachin*, 357 F.3d at 202.

We now join those circuits that have held that an inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983. *See Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) ("The Prison Officials argue that it is also a prerequisite for the inmate to establish that the challenged prison policy

23

'substantially burdens' his or her religious beliefs. There is no support for that assertion.") (citation omitted); *Butts v. Martin*, 877 F.3d 571, 585 (5th Cir. 2017) ("[T]his Court has not required a preliminary showing that a regulation substantially interferes with an inmate's religious rights before assessing whether the regulation is reasonably related to a penological interest."); *Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) ("Given the Supreme Court's disapproval of the centrality test, we are satisfied that the sincerity test … determines whether the Free Exercise Clause applies.").[11]

When adjudicating claims under RFRA, courts must conduct a substantial burden inquiry because the statute requires it. *See* 42 U.S.C. § 2000bb-1. This difference between RFRA and § 1983 makes sense because RFRA authorizes "a 'religious practice' exception" from generally applicable laws while First Amendment

---

[11] We disagree with those circuits that continue to apply the substantial burden test. *See Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017) ("In order to state a claim for violation of rights secured by the Free Exercise Clause, an inmate … must demonstrate that … a prison practice or policy places a substantial burden on his ability to practice his religion."); *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1054 (8th Cir. 2020) ("We agree with the district court's interpretation and application of the substantially burdens requirement in this case."); *Williams v. Hansen*, 5 F.4th 1129, 1133 (10th Cir. 2021) ("To state a valid constitutional claim, a prisoner must allege facts showing that officials substantially burdened a sincerely held religious belief."); *Levitan*, 281 F.3d at 1319 ("[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice.").

doctrine—and by extension § 1983—does not. *Smith*, 494 U.S. at 887 n.4.[12]

Even in the RFRA context, however, the substantial burden inquiry does not authorize courts to determine the centrality of the burdened practice to the plaintiff's religion. *See* 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"); *id.* § 2000bb-2(4) (providing that, for purposes of RFRA, "the term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title"). Instead, RFRA requires an objective inquiry into the extent of the governmental pressure on the plaintiff's exercise of religion. *See Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (explaining that a substantial burden under RFRA "exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs'") (quoting *Thomas*, 450 U.S. at 718); *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719-20 (2014) (deciding that a mandate "'substantially burdens' the exercise of religion" because it imposes "severe" and "substantial economic consequences" on the plaintiffs' adherence to their "sincere religious belief") (alteration omitted) (quoting 42 U.S.C. § 2000bb-1(a)); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (explaining that "under

---

[12] The Religious Land Use and Institutionalized Persons Act ("RLUPIA"), which applies to inmates such as Kravitz and authorizes religious exemptions, also requires a substantial burden inquiry. 42 U.S.C. § 2000cc-1(a). RLUIPA "allows prisoners to 'seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Holt*, 574 U.S. at 358 (quoting *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006)).

RFRA, the Departments must accept the sincerely held complicity-based objections of religious entities" and could not decide that "the connection between what the objecting parties must do and the end that they find to be morally wrong is simply too attenuated") (internal quotation marks and alterations omitted).[13]

In the context of a § 1983 claim for a violation of the First Amendment, there is no requirement to show that the governmental burden on religious beliefs was "substantial." Rather, "a plaintiff may carry the burden of proving a free exercise violation ... by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 142 S. Ct. at 2421-22 (quoting *Smith*, 494 U.S. at 880).

## C

Courts that apply the substantial burden test suggest that it disposes of free exercise claims that "find [no] support in the religion to which [plaintiffs] subscribe" or that are "self-serving." *Levitan*, 281 F.3d at 1321. For a claim under § 1983, the "threshold question of sincerity" serves that function. *United States v. Seeger*, 380 U.S. 163, 185

---

[13] *See also* Michael A. Helfand, *Identifying Substantial Burdens*, 2016 U. Ill. L. Rev. 1771, 1775 ("[I]n order to determine whether a burden is substantial, courts must examine the substantiality of the *civil penalties triggered by religious exercise*. By focusing on the substantiality of civil penalties—as opposed to the substantiality of religious or theological burdens—courts can avoid Establishment Clause concerns, while still enforcing the threshold inquiry required by RFRA. In this way, courts can both avoid allocating government burdens on the basis of a judicial inquiry into theology, while still ensuring that RFRA's protections are not granted simply on the say so of claimants who assert that the burdens they have experienced are substantial.").

(1965). A court's inquiry into sincerity "properly extends to determining 'whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things, religious.'" *Patrick*, 745 F.2d at 157 (quoting *Seeger*, 380 U.S. at 185). The sincerity test "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Id.*

While "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs," *id.*, courts "are clearly competent to determine whether religious beliefs are 'sincerely held,'" *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999). Such an inquiry is "largely a matter of individual credibility" rather than an examination of "applicable religious tenets." *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485-86 (5th Cir. 2014). And the inquiry can dispose of claims that are "so clearly nonreligious in motivation" as not to merit First Amendment protection. *Thomas*, 450 U.S. at 715. "The distinction between questions of centrality and questions of sincerity and burden is admittedly fine, but it is one that is an established part of our free exercise doctrine and one that courts are capable of making." *Smith*, 494 U.S. at 907 (O'Connor, J., concurring in the judgment) (citation omitted).

## D

Although Kravitz was incarcerated, "prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone*, 482 U.S. at 348 (citation omitted). Indeed,

27

"[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford*, 352 F.3d at 588.

In the prison context, however, "the right to free exercise of religion" is balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). Therefore, an infringement of the free exercise of religion is permissible only if it is "reasonably related to legitimate penological interests." *Id.* (quoting *Turner*, 482 U.S. at 89).[14] In short, "[t]o assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers ... legitimate penological objective[s]." *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988).

In this case, the district court addressed only the threshold substantial burden test without proceeding to consider the relationship to legitimate penological interests. The district court

[14] In *Turner*, the Supreme Court identified four factors to be considered in assessing whether a regulation is reasonably related to legitimate penological interests: (1) "whether there is a rational relationship between the regulation and the legitimate government interests asserted," (2) "whether the inmates have alternative means to exercise the right," (3) "the impact that accommodation of the right will have on the prison system," and (4) "whether ready alternatives exist which accommodate the right and satisfy the governmental interest." *Benjamin*, 905 F.2d at 574 (citing *Turner*, 482 U.S. at 89-90).

28

reasoned that, "had McMahon and Wassweiler caused Plaintiff to miss the *Shavuot prayers and meal* on June 4, 2014, that single missed celebration would have constituted a substantial burden on Plaintiff's free exercise given Shavuot's central importance." *Kravitz*, 2022 WL 768682, at *9 (emphasis added). According to the district court, however, Kravitz's "Shavuot celebration was only shortened, not denied" because he was able to "congregate, pray, and eat a festive kosher meal." *Id.* at *10.

Kravitz can prevail on his claim because he has shown a burden on his sincere religious beliefs. It is not in dispute that Kravitz practices Judaism and considers the observance of Shavuot with communal prayer to be a religious practice. Nor do the officers dispute that Kravitz observes the holiday pursuant to sincerely held religious beliefs. Memorandum in Support of Defendants' Motion for Summary Judgment at 5, *Kravitz v. Purcell*, No. 16-CV-8999 (S.D.N.Y. Mar. 10, 2021), ECF No. 128; *see also* Oral Argument Audio Recording at 8:09 ("[W]e are not questioning the sincerity of his religious beliefs."). The admissible evidence shows that Kravitz was unable to observe his religious holiday due to the abusive conduct of corrections officers. On the first night, corrections officers obstructed all communal prayer and threw paper bags at the inmates, "laughing and say[ing], here is your kosher meal. You Jew, blah, blah, and F-U." Kravitz Dep. at 67. On the second night, an officer interrupted Kravitz's prayer after approximately thirty seconds, stating, "I don't want to hear that. You need to stop and get eating that food. I got things to do." *Id.* at 92.

The district court erred in deciding that the burden on Kravitz's observance was insufficient to establish an infringement of his right

29

to free exercise under the First Amendment. The district court could reach that conclusion only by deciding that thirty seconds of prayer or a blessing over bread suffices for Shavuot observance.[15] But what the observance of Shavuot entails is beyond the competence of a federal court. Kravitz has produced evidence showing that his sincere religious beliefs were burdened, and that is enough to survive a motion for summary judgment.

## II

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" is "liable to the party injured."

To "establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show … the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To do so, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "The factors necessary to establish a § 1983 violation will vary with the

---

[15] To the extent that the district court thought that the blessing over bread constituted a Shavuot prayer rather than a component of the meal, the district court misunderstood Kravitz's observance. *See* Kravitz Dep. at 94 ("[B]efore you eat, … you pray over the meal, the bread. … Well, first the wine, and then the bread, and then we eat.").

constitutional provision at issue because the elements of different constitutional violations vary." *Id.* (internal quotation marks and alteration omitted). In the context of the Free Exercise Clause, we have explained that liability depends on an officer-defendant acting with at least deliberate indifference in depriving an inmate of the ability to engage in a religious practice. *Wiggins*, 2023 WL 8009312, at *8.

Officers Zupan, Purcell, Baker, St. Victor, McCray, and Andreu testified that they did not participate in the alleged incidents. They either did not work on the evenings of June 3 and 4 or they worked in different areas of the prison at the relevant times.

Although Kravitz stated in an affidavit that these officers were present on the evening of June 3, he conceded in deposition testimony that this statement was not based on personal knowledge. When a party relies on an affidavit to establish facts on summary judgment, "the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant … is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)). The district court properly dismissed the claims against these officers because Kravitz could not identify admissible evidence that the officers were personally involved in the alleged deprivation of Kravitz's rights.

Kravitz does not challenge that determination on appeal. He now claims that McMahon and Wassweiler were involved in the events of both nights of Shavuot, rather than only those of June 4. McMahon and Wassweiler were the "religious services officers [who] completely prevented him from observing Shavuot on the first night of the holiday and on the second night stopped the prayer service at its inception." Appellant's Br. 17 (emphasis omitted).

The district court did not err in recognizing that Kravitz's claims against McMahon and Wassweiler did not extend to the events of June 3. *See Kravitz*, 2022 WL 768682, at *9 ("In the TAC, Plaintiff alleges that Purcell, Baker, Andreu, McCray, and St. Victor were responsible for the deprivation of Plaintiff's free exercise rights via the incident on June 3, 2014, and McMahon, Wassweiler, and Zupan were responsible for the deprivation of Plaintiff's free exercise rights via the incident on June 4, 2014."). Kravitz's complaint and Rule 56.1 Statement do not state that McMahon and Wassweiler were involved in the June 3 incident.[16] But to identify the defendants involved in each incident, Kravitz relied on the Attorney General's response to the district court's *Valentin* order. As it turns out, the Attorney General identified officers who were not involved in the events of June 3. On remand, the district court may decide to issue a new *Valentin* order, permit additional discovery, or permit leave to amend. In other words, "[t]he district court may pursue any course that it deems appropriate to a further inquiry into the identity" of the defendants. *Valentin*, 121 F.3d at 75; *see also Lurch v. Doe Officers*, No. 22-CV-2324, 2022 WL 17617837, at *2 (S.D.N.Y. Dec. 13, 2022) (noting that a district court may take additional steps when the "accuracy or sufficiency" of a *Valentin* response is in question).

---

[16] The record as a whole is ambiguous as to whether McMahon and Wassweiler participated in the events of June 3. The record does not contain declarations from McMahon or Wassweiler. The Attorney General, however, represented that McMahon and Wassweiler were the "officers assigned to the Jewish holiday services." *Valentin* Response at 1. While Kravitz testified that he interacted with different officers on the two evenings, he also testified that the officers "all look the same to me" and that he was careful not to look directly at them. Kravitz Dep. at 79-80.

**CONCLUSION**

Kravitz has sufficiently demonstrated a burden on his sincere religious beliefs such that the district court erred in granting summary judgment to the defendants. We vacate the judgment insofar as the district court granted summary judgment because Kravitz did not show a substantial burden. We affirm the judgment insofar as the district court granted summary judgment based on the lack of personal involvement of Zupan, Purcell, Baker, St. Victor, McCray, and Andreu. We remand for further proceedings consistent with this opinion.